## Infomercial Production Agreement

This Infomercial Production Agreement is made by and between Tara Productions, located at 3589 SW 10th Street, Pompano Beach, FL 33069 (herein referred to as "Producer") and TV Products USA, Inc, located at _____ (herein referred to as "Client").

1. **Scope of Work.** Producer shall write the script for and produce the following: fully-edited generic (i.e. without product ordering information) 2 minute, 0 second and A 60 second television commercials (collectively, the "Commercial") for ALWAYS FRESH CONTAINER (herein referred to as the "Product"). "Product" shall include all components as are advertised and offered for sale in the Commercial produced under this Agreement and the upsell products ("Upsells") that are offered in the Commercial including any continuity sales of the Product. Upsells shall not include unrelated products offered solely by telemarketers to consumers responding to inbound calls following the broadcast of the Commercial.

   (a) **Production Schedule.** The production schedule shall be determined by the mutual agreement of the parties, and will be initialed or signed by the parties when it is agreed upon. Producer shall not be liable to Client for expenses incurred or losses suffered by Client by reason of delays resulting from causes not within Producer's control. Client shall reimburse Producer for expenses incurred by Producer as a result of such delays, but Client shall have no obligation to reimburse Producer for expenses incurred by Producer solely as a result of delays caused by Producer solely without good reason.

   (b) **Product Samples.** Client shall provide all samples of Product to be used in the Commercial including mockups and TV-ready comps of the Product, if necessary, to be used for shooting purposes at least six (6) weeks prior to shooting date.

   (c) **Talent.** Except with respect to the Testimonials as provided in Paragraph 1(d) below, Client shall furnish and pay for any talent appearing in the Commercial, and shall obtain from all such talent all necessary or desirable agreements, permissions and releases including, without limitation, duly sworn affidavits attesting to the truth and accuracy of the individual's testimony. Client shall be solely responsible for any and all pension, health or other payments required under the rules, regulations or requirements of any applicable collective bargaining agreement with any union representing talent participating in the Commercial. Client shall indemnify and hold Producer harmless from and against any and all damages, expenses, claims, suits, judgments, penalties and costs including reasonable counsel fees and all losses of any kind arising out of Client's actual or alleged breach of such agreements.

   (d) **Testimonials.** Producer shall provide the testimonial footage to be included in the Commercial (the "Testimonials") and shall obtain from all such persons all necessary or desirable agreements, permissions and releases including, without limitation, duly sworn affidavits attesting to the truth and accuracy of the individual's testimony.

   (e) **Client's Use of Commercials.** Provided that Client has paid Producer all sums due to the Producer hereunder pursuant to Paragraph 2, Client shall have absolute control over the media placement and strategy of use of the Commercial; provided, however, that no part of the Commercial shall be used

EXHIBIT 1

for any purpose other than to sell the Product by means of direct response television marketing without the prior written consent of Producer; provided further, however, that Client may use the before and after photographs for direct response print campaigns, subject to the rights of any third parties of which Producer shall have informed Client.

(f) **Producer's Use of Commercials.** Producer shall have the right to use the Commercial in Producer's promotional reel and to enter the Commercial in industry competitions, festivals and shows for Producer's publicity and promotional purposes without the payment of any compensation to Client or any talent participating in the Commercial. Client shall cause Producer to be afforded on-screen credit in all versions of the final Commercial to the extent customary in the industry.

2. **Budget.**

(a) **Payment.** Client agrees to pay Producer a production budget (the "Budget") to write and produce the Commercial in the amount as set forth in a separate document on which the parties have placed or will place their signatures or initials which document is attached hereto as Schedule A. Payment of the Budget shall be made as follows: one-quarter (¼) within seven business days of execution of this Agreement; one-quarter (¼) not less than five business days prior to shooting; one-quarter (¼) within not less than five business days prior to the start of editing, and one-quarter (¼) plus any overages upon presentation of a "view tape" (a video cassette of a generic copy of the Commercial). It is hereby understood that no edited masters or camera masters will be released to Client until final payment has been submitted to Producer. Producer will keep an up-to-date accounting of its expenses incurred in the project. This accounting will be furnished to Client in the event the Agreement is terminated pursuant to Paragraph 12 below. Client agrees that it shall have no right to use the Commercial until all payments required hereunder have been made in full.

(b) **Out-Of-Scope Services.** Any additional production work requested by Client involving changes to previously-approved or agreed-upon work or Budget items, including, but not limited to, changes in the Product, final script, locations, talent and testimonials, shall be mutually agreed upon by the parties in writing, and appropriate adjustments in the Budget shall be made with respect thereto. In the event such adjustments require additional payment to Producer, Client shall pay fifty percent (50%) of such sum prior to the commencement of such additional work and fifty percent (50%) upon completion of such additional work. It is agreed that after approval by Client of the final edited master that is sent to television stations or cable companies for test marketing, any changes such as to price points or to the call to action or to the script, or otherwise, shall be considered a revision for which additional charges will be paid by Client.

(c) **Expenses.** In addition to the items set forth in the Budget, Client shall reimburse Producer for any and all bona fide expenditures incurred by Producer directly in connection with the Commercial or in the performance of Producer's services hereunder which are reasonably substantiated. Upon the submission of invoices, vouchers, expense statements and the like, Client shall reimburse Producer for all reasonable and customary out - of - pocket expenses (coach airline travel), provided that any expenses aggregating in excess of 10% of the Budget shall require the advance written approval of Client.

(d) **Shipping.** Client will provide to Producer Client's Federal Express account number or other overnight delivery service (as indicated below Client's signature at the end of this Agreement) for

- 2 -

Producer to use only in shipping materials on behalf of Client that require expedited delivery, such as master tapes and production related items.

3. **Ownership.**

(a) **By Client.** Provided that Client has made all payments to Producer as required under Paragraph 2 and all payments as required under Paragraph 6 continued to be paid, Producer agrees that the copyrights and all other rights, title and interest in and to the Commercial, the written or tangible audio, except for any music included in the Commercial, and visual materials (such as titles, scripts and film footage) used in the Commercial (collectively referred to herein as the "Work") shall be works-made-for-hire and that Producer does not have, nor shall Producer claim to have, under this Agreement or otherwise, any right, title or interest of any kind or manner in and to the Work, and that all rights therein shall be the sole and exclusive property of Client. In the event that for any reason the Work is deemed not to be a work-made-for-hire, then in that event Producer shall upon payment to Producer of all payment required pursuant to Paragraph 2, assign all right, title and interest in and to the Work to Client. Producer shall deliver to Client all unused film footage that is specific to the Product, host, talent and testimonials, together with copies of releases from any individuals who may be in such footage. Client's subsequent use of such film footage shall be subject to any limitations on usage that the individuals may have imposed in their respective releases, any royalties that may have to be paid to such individuals for the use of their images, voice and persona and any other rights held by third parties of which Producer has informed Client..

(b) **By Producer.** Producer shall singularly own all rights, title and interest in and to the remaining unused written or tangible audio and visual materials that does not include the Product, host, or testimonials, including the unused scripts and film footage. Producer may retain for its files and use for promotional purposes copies of the Commercial. Producer may also use generic B-Roll footage (i.e., footage that is not product specific) from the Commercial in other commercials.

4. **Approvals.**

(a) **Scripts.** Client shall have the right and obligation to approve in writing the shooting script before the commencement of the principal videotaping of the Commercial. Such approval shall constitute Client's verification and representation to Producer of the truth and accuracy of all statements, whether express or implied, and claims concerning the Product, whether express or implied, made in the script and the Commercial. Client shall respond to written (includes email) requests for approval of changes to the script promptly following submission by Producer. Producer shall not shoot the Commercial until the script has been approved by Client, and if Client so chooses, by Client's legal counsel.

(b) **Client Materials.** Client acknowledges and agrees that in developing the script Producer shall rely upon and base all Product claims or statements about the Product on materials and information provided to Producer by Client (the "Client Materials"). Client represents and warrants that the Client Materials are truthful, accurate and fully substantiated as required under all applicable state and federal laws, rules and regulations. In creating the script, Producer may suggest claims to be made about the Product based on the Client Materials. Client agrees that Producer is not responsible for ensuring that such suggested claims are substantiated and that Producer is merely presenting the suggested claims to

- 3 -

Client for Client's consideration and evaluation so that Client can independently determine if such claim is truthful, accurate and fully substantiated. Client shall be responsible for ensuring that all claims and statements made in the Commercial about the Product are fully substantiated and truthful, including those claims suggested to it by Producer.

5. **Indemnification.**

(a) **By Client.** Client shall indemnify, defend and hold harmless Producer, its principals, officers, directors, employees, independent contractors, agents, successors, assigns and licensees from all suits, claims, demands and other liabilities and expenses (including, but not limited to, actual damages, punitive damages, fines, and reasonable attorney's fees) arising out of (i) the breach by Client of, or any inconsistency with, any warranty, representation, covenant, term or condition made or agreed to herein by Client; (ii) any claims or allegations related to the Product generally, including, but not limited to, the safety and efficacy of the Product, compliance with the rules, regulations and guidelines of the Federal Trade Commission or any other governmental agency regarding false and deceptive advertising practices, product liability, infringement of patent, copyright or trademark rights, other intellectual property rights, or rights of privacy; (iii) the Client Materials; or (iv) any acts or omissions of any third party retained by Client hereunder, including but not limited to manufacturers and distributors.

(b) **By Producer.** Producer shall indemnify, defend and hold harmless Client, its principals, officers, directors, employees, independent contractors, agents, successors, assigns and licensees, from all suits, claims, demands and other liabilities and expenses (including, but not limited to, actual damages, punitive damages, fines and reasonable attorney's fees) arising out of the breach by Producer of, or any inconsistency with, any warranty, representation, term or condition made or agreed to herein by Producer.

(c) **Defense.** The party provided the indemnity may select and retain counsel and control the defense of any claim or lawsuit or matter for which it is obligated to make payment under this section, with the reasonable costs thereof to be paid by the party providing the indemnity.

6. **Royalty to Producer.**

(a) **Royalty.** In addition to the payments required under Paragraph 2 above, Client shall pay Producer a royalty payment of two percent (2%) of the actual cash collections (but not including sales tax and shipping and handling receipts) of Client from all sales of the Product, including Upsells, worldwide, but net of refunds, bad debt and returns. Without limiting the generality of the foregoing, the royalty shall be paid on sales via inbound telephone calls, remittances mailed in, or other means made directly to end users through direct response television. It shall be paid on sales made (at the wholesale price) to or through television home shopping channels such as HSN and QVC. It shall be paid on sales via whatever additional means may be utilized, including without limitation, radio, all print media, direct mail solicitation, direct sales, telemarketing, Internet sales, credit card syndication, catalog sales, sales at wholesale for resale by retailers, and sales, if any, made directly at retail by Client [handwritten: retailers — 1% only on all net collections - JM]

(b) ~~**Distribution Outside the U.S.** For distribution of the Product outside of the United States, Client may license one or more third party distributors to sell the Products using the Commercial and may sell the Product to such licensees at wholesale. In this situation, the royalty will be paid on the wholesale revenue received by Client from such sales.~~

- 4 -

(c) **Distribution Inside the U.S.** For distribution within the United States, Client may license one or more third party distributors to sell the Products and may either sell the Products to such third parties at wholesale or license the third parties to manufacture and sell the Products in exchange for a royalty or a similar payment. If Client licenses the third party to manufacture and sell the Products in exchange for a royalty or a similar payment, Client shall either pay to Producer the royalties that would have been paid to Producer pursuant to Paragraph 6 (a) above the same as if Client had directly manufactured and sold the Products or shall see that the third party distributor assumes the obligation of Client to make such payments directly to Producer, provided that any such assumption by a third party shall not relieve Client of its payment obligations hereunder. When accounting to Producer, in addition to furnishing the statements and reports required in paragraph 8 below, Client shall furnish Producer with copies of statements received from such third-party licensees.

(d) **Payment.** All royalties shall be paid to the Producer on or before the 45th day following each calendar quarter, commencing with the first sale of any Products. In the event that Client has not paid to Producer the royalties due for more than two consecutive quarters, the ownership rights granted to Client under Paragraph 3(a) above shall be revoked and all right, title and interest in and to the Infomercial shall revert back to Producer and Client shall have no right to make further use of the Infomercial.

(e) **Additional Use of Commercials.** Client agrees that it will not use any substantial or significant part of the Commercial (other than any material, including film footage and scripts, that was supplied by Client to Producer) to sell any other product without the payment to Producer of a mutually agreed upon royalty, which amount shall not be less than that contained in this Paragraph.

7. **Accounting; Books and Records.**

(a) **Royalty Statement.** Each payment of royalties from Client to Producer shall be accompanied by a detailed accounting statement setting forth the number of units of the Product sold during the applicable calendar month, the actual selling prices, shipping and handling charges, tax charges, and the calculation of the amount of royalties shown thereby to be due to Producer for such month.

(b) **Request for Reports.** Upon request, Client shall within ten (10) business days provide to Producer, or cause Producer to be provided with copies of, all fulfillment reports, a list of airing dates, those parties from whom air time was purchased, the total media expense for the prior calendar month, and cumulative total of media expense for all prior months.

(c) **Maintenance of Books.** Client shall maintain complete and accurate books and records with respect to all matters set forth herein. Producer shall have the right, not more than two times per calendar year, to have an accountant examine Client's books and records pertaining to the number of units of the Product sold, actual selling prices, shipping and handling charges, tax charges, fulfillment reports, airing dates, those parties from whom air time was purchased, media expenses, and royalties due to Producer hereunder, and to make photocopies and extracts thereof. Such examination shall take place during normal business hours at the place where such books and records are regularly kept at Producer's expense; provided, however, that if any such examination shall reveal that Client has paid to Producer less than ninety-five (95%) percent of the royalties properly due and owing to Producer for the relevant

JUL-8-2010 09:14A FROM:TARAIPRODUCTIONS 9549779007 TO:9545667115 P.5

accounting period(s), then Client shall pay or reimburse Producer for the reasonable costs of conducting such examination.

(d) **Overdue Amounts.** Client shall pay Producer interest, calculated at the rate of 12% per annum, on any royalties paid more than 30 days after the due date. Client shall also be responsible for any attorneys' fees and any other expenses incurred by Producer to seek payment of overdue amounts hereunder.

8. **Music Rights and Royalties.** All music included in the Commercial shall be original music created by a composer independently contracted by Producer. The composer shall retain ownership of all right, title and interest in and to such music; shall retain one hundred percent (100%) of the publishing rights and shall be entitled to one hundred percent (100%) of the publishing royalties in connection with such music. Notwithstanding anything to the contrary above, Producer shall cause the composer to grant to Client the non-exclusive, perpetual, royalty-free right to use such music in, and in connection with the Commercial.

9. **Client's Representations.** Client hereby represents, warrants and covenants to Producer that:

(a) It has the full right, power and authority to enter into and to perform this Agreement and grant all of the rights hereunder granted to Producer;

(b) It will comply with all applicable laws, rules and regulations governing the performance of its obligations hereunder;

(c) The Product, product packaging and all collateral material pertaining thereto does not infringe or conflict with any copyright, trademark or any other right of any third party;

(d) The Product currently complies and, as advertised in the Commercial and sold to customers, will comply with all applicable federal, state and local laws, rules and regulations;

(e) The Client Materials and any other information, facts, claims, product comparisons, representations, opinions, endorsements, impressions, warranties or other information expressed and/or implied concerning the Product made in the Commercial, or any other Client Materials provided to Producer by Client shall be truthful and supported by appropriate testing, case histories and/or laboratory documentation, all of which are in the possession of Client, and shall comply with all applicable statutes, ordinances, laws, advertising restrictions and all other governmental rules and regulations applicable to the advertising, production, distribution and marketing of the Product;

(f) The marketing and sale of the Product as contemplated herein will neither infringe upon nor violate the rights of any third party, including, but not limited to, rights of privacy and rights with respect to any patent, copyright, trademark, trade name or service mark;

(g) The Product is safe when used in accordance with instructions to be provided by Client to the consumer and it is effective for the purpose intended;

- 6 -

(h) The Product shall not be restricted or prohibited from being introduced or delivered for shipment in interstate commerce within the United States and throughout the world; and

(i) It has or will satisfy any and all governmental or other label, license, consent, inspection and/or approval requirements that are necessary in connection with the offering for sale or sale of the Product as contemplated by this Agreement, including without limitation Food and Drug Administration labeling requirements.

10. **Producer's Representations.** Producer hereby represents, warrants and covenants to Client that:

(a) It has the full right, power and authority to enter into and to perform this Agreement and grant all of the rights hereunder granted to Client;

(b) It will comply with all applicable laws, rules and regulations governing the performance of its obligations hereunder; and

(c) To the best of its knowledge, the Commercial (excluding any portion supplied to Producer by Client) does not intentionally infringe or conflict with any copyright or other intellectual property right of any third party.

11. **Term and Termination.**

(a) **Term.** The "Term" of this Agreement shall commence upon the execution of this Agreement and shall continue unless terminated by a party in accordance with the provisions below.

(b) **Termination by Client.** Client may terminate this Agreement at any time during the production of the Commercial by notice to Producer.

(c) **Termination by Producer.** Producer may immediately terminate this Agreement at any time during the production of the Commercial in the event Client shall breach this Agreement, or in the event that any representation or warranty made by Client herein or in connection with the execution and delivery of this Agreement shall prove to have been incorrect, when made, in any material respect.

(d) **Effects of Termination.** In the event of termination of this Agreement, Client shall reimburse Producer for all of its expenses through the date of termination, and (i) in the event Producer has completed less than one-half (1/2) of its services (as defined by the % of total budget that has been paid out at the date of termination) hereunder, Client shall pay Producer fifty (50%) percent of its Production Fee as set forth in the Budget, or (ii) in the event Producer has completed one-half (1/2) or more of its services hereunder (as defined by the % of total budget that has been paid out at the date of termination), Client shall pay Producer its full Production Fee as set forth in the Budget.



- 7 -

12. **Confidentiality.**

(a) **Confidential Information.** The parties recognize that during the course of performing their duties hereunder they may become aware of proprietary, confidential information concerning the other party, its products, methods, processed, billing practices or financial condition or information the other party designates as confidential (collectively, "Confidential Information"). Either party receiving Confidential Information (a "Receiving Party") from the other party (a "Conveying Party") shall hold all Confidential Information in the strictest confidence and shall not disclose, except to its officers, employees, advisors and consultants who have a need to know, at any time any such Confidential Information and shall not use any such information to the detriment of the other party or for any purpose not contemplated by this Agreement.

(b) **Exceptions.** The obligation of confidentiality set forth in Section 12(a) shall survive the expiration or other termination of this Agreement; provided, however, that a party may disclose Confidential Information which ( i ) is or becomes generally available to the public through no act of the Receiving Party in breach of the Agreement; (ii) was lawfully in the possession of the Receiving Party without any restriction on use or disclosure prior to its disclosure hereunder; (iii) is developed independently and is not based upon or derived from Confidential Information; and (iv) is required to be disclosed by applicable law or the order of any court of competent jurisdiction (provided in such latter case, however, that the Receiving Party shall provide the other party with prompt notice of any such requirement so that the Conveying Party may attempt by appropriate legal means to limit such disclosure, and the Receiving Party shall further use its best efforts to limit the disclosure and maintain confidentiality to the maximum extent possible.

13. **Sequels and Subsequent Commercials.** Producer shall have the right to produce any sequel or subsequent commercial or infomercial featuring the Product or related products or any modified version of the Product under the same terms and conditions as this Agreement, if the Producer is able to start and complete production at the dates required by Client within reasonable budgetary constraints.

14. **Miscellaneous.**

(a) **Force Majeure.** Producer may suspend the performance of its obligations hereunder in the event of any of the following contingencies, if by reason of any such contingency, Producer is materially hampered in the performance of its obligations hereunder or such performance becomes impossible or commercially impracticable: Act of God, fire, catastrophe, terrorism, labor disagreement, acts of government, or any order, regulation, ruling or action of any labor union or association affecting Producer or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond Producer's control.

(b) **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Florida, without regard to conflicts of law provisions.

(c) **Venue.** All disputes between the parties arising out of or relating to this Agreement shall be heard in the appropriate State or Federal court in Broward County, Florida. The parties irrevocably consent to the jurisdiction of such courts.

(d)     **Independent Contractors.** The parties to this Agreement are acting as independent contractors and nothing herein shall be construed as creating a partnership or other joint business venture between them. Neither party has the authority to act on behalf of, or bind the other except as expressly set forth herein.

(e)     **Severability.** In the event that any provision of this Agreement is held to be unenforceable or contrary to law, then the Agreement shall be interpreted, to the extent possible, without such provision.

(f)     **Notice.** Any notice required by or provided pursuant to this Agreement shall be given in writing by certified mail, return receipt requested, or by any professional delivery service that requires a signed, written receipt confirming delivery of the envelope or package containing the notice. Such notice shall be addressed to the person signing this Agreement, or at such other address as shall be provided by notice.

(g)     **Taxes.** Each party shall be responsible for reporting and payment of its own federal, state and local taxes and licenses.

(h)     **Entire Agreement.** This Agreement and any schedules attached hereto constitute the entire understanding and agreement of the parties with respect to its subject matter and supersedes any and all prior understandings and agreements.

(i)     **Amendments.** This Agreement may not be amended or modified except by a written instrument signed by the party to be charged.

(j)     **Assignment.** Client may assign this Agreement to any entity of its choice, but Client shall nevertheless remain obligated to Producer for all of its obligations and covenants contained herein.

(k)     **Legal Expenses.** If any legal action or other proceeding (whether or not suit be brought) is initiated for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorney's fees, court costs and all expenses incurred in that action or proceeding, at both the State and Appellate level, even if not taxable as court costs, in addition to any other relief to which such party or parties may be entitled.

JUL-8-2010 09:50A FROM:TARA1PRODUCTIONS 9549779007 TO:9545667115 P.2

15. **Full Execution Required; Counterparts; Facsimiles.** This Agreement shall not become effective unless and until fully executed by all proposed parties hereto. This Agreement may be executed and delivered (i) in two or more counterparts, each of which shall be deemed an original but all of which shall constitute the same Agreement, and (ii) by facsimile, and signatures on a facsimile copy hereof shall be deemed authorized original signatures.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date last written below.

TARA PRODUCTIONS
"Producer"

By: _____   1/20/09
Tara Borakos, President           Date

[_____]
"Client"

By: _____   01/19/2009
                        Date
Print Name: JEFF KURANT

Its: _____

Overnight Delivery Service: _____
Account Number: _____

- 10 -

## SCHEDULE A

## BUDGET

80434568.2

- 11 -